**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**MICHAEL CAMERON**                                                    **CIVIL ACTION**

**VERSUS**                                                                      **NO. 18-9502**

**DARREL VANNOY, WARDEN**                                    **SECTION: "E"(1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

## I. State Court Factual and Procedural Background

Petitioner, Michael Cameron, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On April 11, 2011, Cameron was charged by a bill of indictment with second degree murder in violation of La. Rev. Stat. § 14:30.1.[1] After hearings held on September 23, 2011 and February 9, 2012, the trial court denied petitioner's motions to suppress evidence, statements and identifications.[2] Petitioner's trial commenced on September

---

[1] State Rec., Vol. 1 of 8, Bill of Information dated April 11, 2011, amended December 5, 2012.
[2] State Rec., Vol. 1 of 8, minute entry dated February 9, 2012; Motion to Suppress the Confession filed April 26, 2011; Motion to Suppress the Evidence filed April 26, 2019; Motion to Suppress Evidence of Identification filed April 26, 2011; State Rec., Vol. 4 of 8, hearing transcript of September 23, 2011; hearing transcript of February 9, 2012.

23, 2013 and on September 26, 2013, a jury found petitioner guilty as charged.[3]  On October 18, 2013, the trial court sentenced petitioner to life imprisonment at hard labor.[4]

On October 15, 2014, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence.[5]  The Louisiana Supreme Court denied writs without stated reasons on October 9, 2015.[6]  Petitioner did not file for a writ of certiorari with the United States Supreme Court.

On December 12, 2016, petitioner filed an application for post-conviction relief with the state district court raising the following claims for relief: (1) ineffective assistance of counsel; (2) prosecutorial misconduct based on the use of inadmissible character evidence and false testimony; and (3) denial of the right to present a complete defense.[7]  On January 26, 2017, the state district court found the claims without merit.[8]

On April 5, 2017, the Louisiana Fourth Circuit denied petitioner's writ application.[9]  The Louisiana Supreme Court denied petitioner's related writ application on September 28, 2018, finding petitioner failed to receive ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 20252, 80 L.Ed.2d 674 (1984), and he failed to satisfy his post-conviction burden of proof as to his other claims under La. Code Crim. P. 930.2.[10]

---

[3] State Rec., Vol. 1 of 8, minute entry dated September 23, 2013; minute entry dated September 24, 2013; minute entry dated September 25, 2013; minute entry dated September 26, 2013; verdict dated September 26, 2013; State Rec., Vol. 5 of 8, trial transcript of September 23, 2013; trial transcript of September 24, 2013; State Rec., Vol. 6 of 8, trial transcript of September 25, 2013; State Rec., Vol. 7 of 8, trial transcript of September 26, 2013.
[4] State Rec., Vol. 1 of 8, minute entry dated October 18, 2013; State Rec., Vol. 7 of 8, hearing transcript of October 18, 2013.
[5] State v. Cameron, 152 So. 3d 196 (La. App. 4th Cir. 2014); State Rec., Vol. 7 of 8.
[6] State ex rel. Cameron v. State, 178 So. 3d 997 (La. 2015); State Rec., Vol. 8 of 8.
[7] State Rec., Vol. 2 of 8.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  Petitioner states that he placed his application for post-conviction relief in the mail on December 9, 2016.
[8] State Rec., Vol. 1 of 8, Judgment dated January 26, 2017.
[9] State v. Cameron, No. 2017-K-0133 (La. App. 4th Cir. April 5, 2017); State Rec., Vol. 8 of 8.
[10] State ex rel. Cameron v. State, 253 So.3d 137 (La. 2018) (per curiam); State Rec. Vol. 8 of 8.

On October 9, 2018, petitioner filed the instant federal application seeking habeas corpus relief in which he asserts the following claims for relief:[11]  (1) insufficiency of the evidence; (2) ineffective assistance of counsel; (3) prosecutorial misconduct; and (4) denial of the right to present a complete defense.  The state concedes that petition is timely but argues that the claims are meritless.[12]  Petitioner filed a reply reiterating his arguments.[13]

## II. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The

---

[11] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner signed his petition and certified that he placed it in the prison mailing system on October 9, 2018.  Rec. Doc. 5, p. 15.
[12] Rec. Doc. 17.
[13] Rec. Doc. 19.

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1705 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at

> hand, then by definition the rationale was not clearly established at the time of the
> state-court decision.     AEDPA's carefully constructed framework would be
> undermined if habeas courts introduced rules not clearly established under the guise
> of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases

give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot

be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van

Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has

also expressly cautioned that "an unreasonable application is different from an incorrect one."

Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court

precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir.

2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect

application of the law by a state court will nonetheless be affirmed if it is not simultaneously

unreasonable.").

    While the AEDPA standards of review are strict and narrow, they are purposely so.  As

the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion
> was unreasonable.
>
>     If this standard is difficult to meet, that is because it was meant to be.  As
> amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  It preserves
> authority to issue the writ in cases where there is no possibility fairminded jurists
> could disagree that the state court's decision conflicts with this Court's precedents.
> It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard
> against *extreme malfunctions* in the state criminal justice systems, *not a substitute
> for ordinary error correction through appeal.  As a condition for obtaining habeas
> corpus from a federal court, a state prisoner must show that the state court's ruling
> on the claim being presented in federal court was so lacking in justification that
> there was an error well understood and comprehended in existing law beyond any
> possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White, 134 S. Ct. at

1701.

### III. Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of

this case as follows:

> On November 29, 2010, Eric Roy was attending a concert at the Republic
> nightclub in New Orleans.  While in the V.I.P. section of the club, Mr. Roy was
> attacked and stabbed in the head and neck.  After an extended hospital stay and
> several surgical procedures, Mr. Roy was taken off of life support.
>
> ***
>
> At trial, the State called several witnesses who were present at Republic on
> the night that Mr. Roy was stabbed.  Through those witnesses, the State provided
> the jury with a detailed description of the stabbing incident and subsequent arrest
> and identification of Cameron.
>
> Detective Tindell Murdock testified that he remembered being called to
> Republic on November 29, 2010, to investigate a stabbing.  He arrived at
> approximately 3:30 a.m., and he located two witnesses while assisting the lead
> detective.  He identified the witnesses as Seneca Johnson and Nicole Age.  Det.
> Murdock testified that he interviewed Ms. Johnson about what she witnessed and
> that once he learned the Defendant was in custody in the back of a police car, he
> asked if she would identify a suspect.  From there, Det. Murdock contacted Det.
> Willie Jenkins, who was also assisting in the matter.  According to Det. Murdock,
> Det. Jenkins removed the Defendant from the vehicle and shined a light on him,
> and Ms. Johnson positively identified him as the suspect.  Although the defense
> objected to any statements Det. Murdock said were made by Nicole Age, the court

allowed Det. Murdock to testify that Nicole Age identified the Defendant that evening as the suspect.

On cross-examination Det. Murdock testified that the police conducted a "show-up procedure" because he felt from what he learned from Ms. Johnson that she could identify the suspect regardless of Ms. Johnson stating that she never saw the suspect's face. He testified that he never spoke to the Defendant, nor did he check his hands for blood or bruising. The Detective admitted that he had no written reports from that night because he was not the lead detective.

Ms. Johnson testified at trial that she knew Mr. Roy from going out to nightclubs and that she saw him on November 29, 2010 at Republic. She further testified that she was upstairs in the V.I.P. section of the nightclub during the time that Mr. Roy was attacked. Ms. Johnson stated that she and Mr. Roy went to the bar to buy her friend a drink, and when she turned around she saw a "guy with a bald head, a red jacket" hit Mr. Roy. She claimed that everyone started to scream as he fell to the floor bleeding from his head. Ms. Johnson further stated that Mr. Roy was breathing while he was on the floor, and that she was pushed out of the way by security. She also testified that approximately thirty to forty-five minutes after the incident an NOPD officer asked her if she could identify the person who struck Mr. Roy, and she identified a male in handcuffs, dressed as she earlier described, as the perpetrator.

On cross-examination Ms. Johnson was able to remember names of her friends who were also in proximity to the stabbing so that the defense could call them as witnesses.

Also at trial, Caroline Koerner testified that she knew Mr. Roy, and she was in Republic on November 29, 2010. She testified that the Defendant pushed his way through a crowd of people as if he wanted to instigate a fight. She said that she witnessed the Defendant push Mr. Roy, and he pushed the Defendant back. She further stated that the Defendant was standing approximately one person away from her when she saw him reach into his left pocket, take out a knife, flip the knife open, place it in his right hand, walk up to Mr. Roy, and stab him in the head twice. Ms. Koerner testified that she saw Mr. Roy fall to the ground, and she put her scarf on his head.

Just after the incident, Ms. Koerner testified that an officer came upstairs where she was with Mr. Roy and asked her what happened. At that time, she was taken outside of the nightclub, where she met with detectives and positively identified the Defendant.

Det. Michael Flores testified that over the radio, he learned of a stabbing at Republic, and went to the nightclub. He testified that when he arrived, he spoke with other officers at the scene and learned a victim had been stabbed, and that

another victim, who had a part of his ear bitten off, helped chase down two suspects. Det. Flores was informed that the suspects were in the back of the police car.[7]

[7] The record reveals that Jeremy Cameron, the brother of Michael Cameron, was also at Republic at the time of the murder and was charged with second degree battery.

Det. Flores testified that when he went to the second floor of the nightclub, Mr. Roy's body had already been removed, and there was blood and trash on the floor. He testified that he met with Ms. Kroener and Jeremiah LaFleur, who both gave him a description of the suspect. He stated that he then conducted two separate show-ups, one for the Defendant and one for Jeremy Cameron.

Det. Flores left Republic and went to the hospital, where he met with the other victim, Mr. Kaiser. Mr. Kaiser told him that his ear had been bitten by Jeremy Cameron, and he corroborated Ms. Kroener and Mr. LaFleur's statements. Det. Flores testified that he was called back to the scene from the hospital by the manager of Republic, where he located a knife on the ground where the police unit holding the Defendant and his brother had been earlier parked. He called the crime lab, who came back to photograph the knife.

Mr. LaFleur testified that he was employed at Republic as a bartender on the evening of November 29, 2010. He stated that on that night, he went to the second floor to take a break from the bar on the first floor where he was working. He recalled that he was standing at the left side of the bar facing the V.I.P. section when a physical altercation broke out in front of him. Mr. LaFleur stated that he witnessed a large man, whom he knew as Kevin, spreading the crowd apart in an attempt to break things up. He further testified that he saw a person in a bright red shirt give Kevin an "overhead" punch, and then he saw Kevin stumble to the ground. At that time, Mr. LaFleur then left the scene and told other Republic employees about the chaos going on upstairs.

Mr. LaFleur further testified that he was going to go back into the nightclub but ended up chasing down and apprehending the person he saw earlier in the bright red shirt. He stated that shortly after he apprehended the suspect, a policeman took over the stop. He also testified that he spoke to officers that evening and was able to provide a description of the suspect and identify the suspect as the same person whom he saw give an overhead punch to Mr. Roy.

Nicole Age testified that she was acquainted with Mr. Roy, and on the evening of November 29, 2010, he passed her with two drinks in his hands in the V.I.P. room. She stated that he gave her a sip of one of the drinks and was walking away when a fight broke out in front of them. Mr. Roy asked "what's going on?" and proceeded in the direction of the fight. She testified that she saw a bald man with a red shirt hit Mr. Roy in the head, and then saw Mr. Roy bleeding. She stayed with Mr. Roy until the paramedics arrived, and then she was asked by detectives not to leave. Ms. Age testified that at the scene she identified the Defendant as the man who struck Mr. Roy.

Wendy Wiltz testified at trial that she worked for the event promoter and that she knew Mr. Roy because he was a Sunday regular at Republic. She testified that she was at Republic the evening of November 29, 2010, and she was talking to Mr. Roy at the top of the stairs in the V.I.P. section when a fight broke out. She testified that Mr. Roy pushed her out of the way, and she saw a bald man in a red shirt reaching into his boot. She stated that she grabbed a waitress, and they went behind the bar into the office and told the promoter to call for more security. When she returned, she saw Mr. Roy on the ground. She left the nightclub and later returned to retrieve her car. Upon her return she was walking across the street to get her car when she saw a knife in the street.

Desere Chachere testified that she has known the defendant since 2006 or 2007. She identified him in court. She testified that she was at Republic when the incident occurred, and she saw the Defendant and his brother Jeremy. She described her surroundings and testified that she was standing at the bar in the second floor V.I.P. section when a fight ensued. She said she and the Defendant were standing next to one another and that the Defendant was not involved in the fight, did not push anyone, and did not stab anyone.

On cross-examination, Ms. Chachere testified that she saw Jeremy Cameron involved in the fight that was taking place on the stairs. She testified that at no time did the Defendant seek to assist his brother in the altercation. She left when she and Michael Cameron were ushered out by security. She further testified that she later saw the Defendant and his brother handcuffed outside of the nightclub, but never informed the authorities that the Defendant was not involved in the fight inside the nightclub. Ms. Chachere further stated that the Defendant was wearing a red shirt and jeans the night of the murder.

The Defendant testified at trial that he drove to Republic with his brother Jeremy and that he parked his car on a nearby street. He testified that he was at the bar, standing next to Ms. Chachere, when he saw his brother get into a fight. He also testified that he was ushered out with the crowd and was grabbed when exiting, frisked, asked by officers to show his hands, and then placed in the back of a police car. He testified that he did not get into a fight that evening, did not have a knife, and did not have blood on his hands or his clothes.

An audio tape from a jail call revealed that the Defendant mentioned helping his brother during the incident. On cross-examination, the Defendant testified that he mentioned assisting his brother during the phone conversation, but that he only wanted the people fighting with his brother to know who he was.[14]

---

[14] <u>Cameron</u>, 152 So. 3d at 198-201; State Rec. Vol. 7 of 8.

## IV. Petitioner's Claims[15]

### A. Sufficiency of the Evidence

Petitioner's first claim is that there was insufficient evidence to prove that he was in fact the perpetrator of the crime of which he stands convicted. He contends that the prosecution failed to meet its burden of negating a reasonable probability of misidentification and that the show-up identifications of petitioner by witnesses were unjustified, unduly suggestive, and unreliable. He further contends that the testimony of the state's witnesses conflicted and was not consistent with the physical evidence.

Petitioner raised the issue of the suggestiveness of the show-up in his motion to suppress the identification.[16] After hearings, the trial court denied the motion.[17] The sole claim raised by petitioner on direct appeal was insufficiency of the evidence.[18] Nonetheless, the Louisiana Fourth Circuit Court of Appeal, in denying petitioner's insufficiency of the evidence claim, also addressed the reliability of the witnesses' identification of petitioner under Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), holding:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, this Court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.[1] However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The factfinder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.[2] A factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence.[3]
>
> [1] Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560; State v. Green, 588 So.2d 757, 758 (La. App. 4 Cir.1991).

---

[15] For ease of analysis, this Report and Recommendation addresses petitioner's claims in a different order than they were listed in his federal petition.

[16] State Rec., Vol. 1 of 8, Motion to Suppress Evidence of Identification filed April 26, 2011.

[17] State Rec., Vol. 1 of 8, minute entry dated September 23, 201; minute entry dated February 9, 2012; State Rec., Vol. 4 of 8, hearing transcript of September 23, 2011; hearing transcript of February 9, 2012.

[18] State Rec., Vol. 7 of 8, Appeal Brief filed March 13, 2014.

[2] State v. Mussall, 523 So.2d 1305, 1309–10 (La. 1988).
[3] State v. McMillian, 10–0812, p. 6 (La. App. 4 Cir. 5/18/11), 65 So.3d 801, 805; State v. Huckabay, 00–1082, p. 33 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111; State v. Harris, 99–3147, p. 6 (La. App. 4 Cir. 5/31/00), 765 So.2d 432, 435.

In addition, "[a]s a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification."[4]  A positive identification by only one witness is sufficient to support a conviction.[5]  The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.[6]

[4] State v. Neal, 00–0674, p. 11 (La. 6/29/01), 796 So.2d 649, 658.
[5] Neal, 00–0674, p. 11, 796 So.2d at 658.
[6] Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

The Defendant does not argue that the State failed to prove the elements of second degree murder, but rather, that the State failed to produce a witness that identified him as the murderer.  He maintains that the witnesses were only able to identify him from his clothing, and one witness, Caroline Koerner, contradicted her testimony when she initially stated that she saw his features and that he had short hair and khaki pants.

The Defendant submits that in light of Jackson v. Virginia, he is not seeking this Court's substitution of judgment for that of the jury; however, he contends that a review of the record will reveal that a rational trier of fact would not have concluded, beyond a reasonable doubt, that he killed Mr. Roy.

The State argues that the Defendant's assignment of error is without merit because it was able to establish that the police, staff from Republic, and others, chased and apprehended the defendant after the stabbing, and those events were corroborated by eyewitnesses.

***

In light of Manson v. Brathwaite, supra, each eyewitness had the opportunity to see the Defendant at the time of the stabbing.  The witnesses testified that, although dim, there was ample lighting in the nightclub, and they were not impaired by alcohol or in any other way to cause their attention to be disrupted. The witnesses all gave an accurate description of the Defendant, and when asked to identify him, the witnesses were confident in their identifications, which took place within a reasonably close time to the murder.

Although the Defendant's testimony, which was somewhat corroborated by Ms. Chachere, maintained that he did not have a knife, was not in a fight, and was grabbed by police among all of the chaos and placed in the back of a police car, the jury was also presented with numerous eyewitnesses that contradicted his account.

Ms. Johnson, Ms. Age, Ms. Kroener and Mr. LaFleur all identified the Defendant on the evening of the murder. Even though the eyewitnesses did not give a detailed facial description of the Defendant, they were all in close proximity to him and the incident. They described, with some variation, a bald, black male, wearing a red shirt and dark pants. This testimony established that each witness had sufficient time to observe the Defendant. This Court cannot disturb the jury's decision in weighing the credibility of the witnesses unless it is clearly contrary to the evidence, which in this case it is not.[8]

> [8] See Harris, 99–3147, 765 So.2d at 435; Huckabay, 00–1082, 809 So.2d at 1111; McMillian, 10–0812, 65 So.3d at 805.

In the present case, there was sufficient evidence for the jury to find that Michael Cameron was the person who stabbed and killed Eric Roy, Jr. The evidence is overwhelming with eyewitness testimony, and the jury was able to compare the testimony to the video surveillance tapes from the evening of the murder. A review of the trial record established that the evidence was clearly sufficient for a jury to find Michael Cameron guilty of second degree murder. Accordingly, his conviction and sentence are affirmed.[19]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[20]

The United States Supreme Court has stated that "reliability is the linchpin in determining the admissibility of identification testimony" under the Due Process Clause. Manson v. Brathwaite, 432 U.S. 98, 114 (1977); see also United States v. Moody, 564 F.3d 754, 762 (5th Cir. 2009). A two-step analysis is employed asking first, whether the identification procedure was impermissibly suggestive and second, whether under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification. Coleman v. Quarterman, 456 F.3d 537, 544 (5th Cir. 2006) (quotations omitted).

With respect to the first prong of the analysis, it must be noted that "show up" identifications are generally considered impermissibly suggestive. See United States v. Shaw, 894 F.2d 689, 692 (5th Cir. 1990); United States v. Lang, No. 06-30124, 2007 WL 1725548, at *10

---

[19] Cameron, 152 So. 3d at 197-198, 201-202; State Rec., Vol. 8 of 8.
[20] State v. Cameron, 178 So. 3d 997 (La. 2015); State ex rel. Cameron v. State, 178 So.3d 997 (La. 2015); State Rec., Vol. 8 of 8.

(5th Cir. June 14, 2007) ("Although we have not held 'show-up' identifications of this type to be per se suggestive, there is certainly room for concern."); Montez v. Thaler, No. 2:09-CV-051, 2012 WL 487094, at *7 (N.D. Tex. Jan. 27, 2012) ("The Fifth Circuit has not held the use of "show-up" identifications is per se suggestive, but such identifications are usually considered unduly suggestive."), adopted, 2012 WL 489156 (N.D. Tex. Feb. 15, 2012).  In fact, as the United States Supreme Court has noted that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds, Griffith v. Kentucky, 479 U.S. 314, 326 (1987). Nevertheless, the use of such a procedure is not unconstitutional *per se*, and "the admission of evidence of a showup without more does not violate due process." Neil v. Biggers, 409 U.S. 188, 198 (1972).

However, even if the Court assumes that the procedure employed was suggestive in this case, that is only half of petitioner's battle.  In order to prevail, he must also show that, under the "totality of the circumstances," that suggestiveness led to a "substantial likelihood of irreparable misidentification."  Here, it did not.

As the state appellate court correctly noted, five factors apply in assessing the reliability of an identification: (1) the witness' opportunity to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' description of the perpetrator; (4) the witness' level of certainty concerning the identification; and (5) the time between the crime and the confrontation. Brathwaite, 432 U.S. at 114-15.  As noted by the Louisiana Fourth Circuit, the ample lightning of the Republic allowed each of the state's eyewitnesses to see petitioner at the time of the incident.  They each gave similar and accurate descriptions of petitioner, and each of them, when asked to identify the perpetrator, confidently identified petitioner.    These

identifications came within an hour of the stabbing.  Thus, there was no substantial likelihood of irreparable misidentification.

Petitioner's related claim challenging the sufficiency of the evidence to support his conviction is similarly meritless.  Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, petitioner has not made such a showing.

As the Louisiana Fourth Circuit correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' "  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).  Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  Cavazos v. Smith, 132 S.Ct. 2, 4

(2011).  Moreover, as the United States Fifth Circuit Court of Appeals has observed: "[A] state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence.  The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law."  Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted).  Further, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Additionally, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal habeas corpus proceedings; in these proceedings, only the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Petitioner was charged with and convicted of second degree murder.  Second-degree murder is defined in relevant part by Louisiana law as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm."  La. Rev. Stat. § 14:30.1(A)(1).  The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act."  La. Rev. Stat. § 14:10(1). Under Louisiana law, intent need not be proven directly, but may be inferred from the actions of the defendant and the circumstances surrounding those actions.  State v. Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); State v. Tate, 851 So.2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La. 1987)).  Specific intent to kill can also be implied by the intentional use of a deadly weapon, such as a knife or gun.  State v. Collins, 43 So.3d 244, 251 (La. App. 1st Cir. 2010) (citing State v. Brunet, 674 So.2d 344, 349 (1996)).

Petitioner does not specifically contest the sufficiency of the proof related to the essential statutory elements of the offenses for which he was convicted, but rather, contends that the state failed to prove beyond a reasonable doubt his identity as the perpetrator.  He contends that none of the witnesses made an in-court identification of petitioner and that the witness testimony was so contradictory that no reasonable juror could have found him guilty.  Finally, he contends that there was no scientific evidence connecting him to the crime.

Under Louisiana law, the state is required to prove the identity of the perpetrator in addition to the elements of the crime.  State v. Draughn, 950 So.2d 583, 593 (La. 2007), cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Thomas, 192 So.3d 291, 303 (La. App. 5th Cir. 2016); State v. Ingram, 888 So.2d 923, 926 (La. App. 5th Cir. 2004).  Where the key issue is identification, the state is required to negate any reasonable probability of misidentification.  State v. Vasquez, 729 So.2d 65, 69 (La. App. 5th Cir. 1999).  Under both

federal and Louisiana law, the testimony of a single eyewitness is generally sufficient to support a conviction.  See United States v. King, 703 F.2d 119, 125 (5th Cir. 1983); State v. Neal, 796 So.2d 649, 658 (La. 2001); State v. Williams, 3 So.3d 526, 529 (La. App. 5th Cir. 2008); see also Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11, 2012), report & recommendation adopted, 2012 WL 2565025 (E.D. La. July 2, 2012).  Discrepancies in witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and an appellate court cannot reassess a credibility determination.  State v. Thomas, 13 So.3d 603, 607 (La. App. 5th Cir. 2008).

The relevant evidence presented at trial was more than sufficient to establish, and petitioner does not contest, that Eric Roy died after being stabbed multiple times.  To prove petitioner's identity as the perpetrator of the crime, the state introduced evidence from multiple witnesses.

Seneca Johnson testified that she witnessed the stabbing of the victim.[21]  She recalled that the perpetrator was a bald male wearing a red shirt.[22]  Johnson explained that the dim lighting was sufficient for her to have a clear and unobstructed view of the perpetrator.[23]  While Johnson waited outside of the club for information about the victim for approximately thirty or forty-five minutes, she told an officer that the perpetrator was bald, wearing a red shirt with a black shirt underneath, and black or dark-colored pants.[24]  The officer removed a bald man who was wearing a red shirt with a black shirt underneath from the back of the police car and shined a light on him so that Johnson had a clear view of him.[25]  Johnson identified the man as the person who stabbed the victim.[26]  Johnson testified that she was not coerced or threatened to make an identification and

---

[21] State Rec., Vol. 5 of 8, trial transcript of September 24, 2013, pp. 25, 35.
[22] Id.
[23] Id., at pp. 25, 27 and 31.
[24] Id., at pp. 28-29.
[25] Id., at pp. 29 and 32.
[26] Id.

that she was certain that the man she identified was the man who struck the victim.[27]  Johnson admitted that she did not see the perpetrator's face, but saw him leave the scene immediately after the incident.[28]

Detective Murdock responded to the scene at approximately 3:30 a.m. and spoke with Johnson and Nicole Age.[29]  After he obtained a statement from Johnson, petitioner, who was wearing a red button-down shirt with a black shirt underneath and dark jeans, was removed from a police car in order for Johnson to view him.[30]  Johnson identified petitioner as the perpetrator.[31] Murdock testified that Johnson was not promised anything to make an identification and her identification was made freely without threats or coercion.[32]

Murdock testified that Age approached him and told him that she had witnessed the incident.[33]  Murdock conducted a separate show-up with Age in the same manner he had done with Johnson, and Age identified petitioner as the perpetrator.[34]  Murdock testified that Age's identification of petitioner was freely given and not the result of coercion, threats, or promises.[35] Murdock made an in-court identification of petitioner.[36]

Caroline Koerner testified that, on the night of the incident, she noticed a man with a red button-down shirt and a black undershirt and khaki-like pants and a second man pushing people in the crowd.[37]  At that time, the victim was approximately ten feet away from her.[38]  She saw the

---

[27] Id., at pp. 29-30.
[28] Id., at p. 32.
[29] Id., at pp. 51-52.
[30] Id., at pp. 53-54.
[31] Id., at p. 54.
[32] Id.
[33] Id., at p. 57.
[34] Id., at pp. 57-58.
[35] Id., at p. 58.
[36] Id.
[37] Id., at p. 92.
[38] Id.

victim push back the man in the red shirt.[39]  The man in the red shirt was approximately one person away from Koerner when she saw him pull something out of his pocket and making a flipping motion with his thumb, which made her believe he had a knife.[40]  She saw him run up to the victim and stab him in the head and neck.[41]  Within twenty minutes of the incident, the police officers asked Koerner what she saw and she told them a man in a red shirt stabbed the victim in the head.[42]  When she went outside to identify the perpetrator, he was not wearing the red shirt, but she recalled that the man looked exactly like the perpetrator and had a very dark complexion and short hair.[43]  She was positive of her identification and was not forced, coerced or threatened into identifying him.[44]

Detective Flores testified that he was alerted to the stabbing and, when he arrived at the scene, he learned a second victim, whose ear had been bitten off, chased two subjects and those subjects were being held in a police car.[45]  Flores met with Koerner and Jeremiah LaFleur who both told him the perpetrator was wearing a red button-down shirt.[46]  Flores conducted separate show-ups and both Koerner and LaFleur identified petitioner, who Flores identified in court.[47]  Several hours later, Flores returned to the scene and located a knife on the ground where the Sheriff's units petitioner and his brother had been placed in had been previously parked.[48]  Flores made an in-court identification of the red button-down shirt petitioner was wearing when he was identified by Koerner and LaFleur.[49]

---

[39] Id., at pp. 93, 95.
[40] Id., at pp. 93-94.
[41] Id., at pp. 94-95.
[42] Id., at pp. 97-98.
[43] Id., at pp. 98, 110.
[44] Id., at p. 99.
[45] Id., at p. 115.
[46] Id., at pp. 119-121, 135, 138.
[47] Id., at pp. 122-123, 128, 139.
[48] Id., at pp. 128-129.
[49] Id., at p. 152.

Jeremiah LaFleur testified he was working on the second floor of the Republic Night Club on the night of the incident.[50] LaFleur testified that he saw an altercation and saw a man in a bright red shirt throw an overhand punch at the victim.[51] LaFleur ran downstairs and alerted the security guards.[52] LaFleur saw the man in the red shirt run out the exit door.[53] LaFleur grabbed the man and the police took over.[54] LaFleur identified a surveillance video depicting the outside of the club and the video was played for the jury.[55] LaFleur explained that a man in a black shirt also ran outside and that Jeremiah Kaiser, whose ear was "hanging off" followed that man and said, "That's the guy" and "I want him."[56] LaFleur spoke with the police within an hour of the incident and he identified the man he saw throw the punch.[57] LaFleur testified that the officers did not force, coerce or threaten him to make an identification nor was he offered anything to identify the perpetrator.[58]

Nicole Age testified that she was on the second floor of the Republic Night Club when a fight broke out.[59] Age saw the victim walk towards the fight and ask, "What's going on?"[60] She then witnessed a man in a red shirt and dark pants with a bald head hit the victim twice.[61] The victim fell to the ground bleeding, and Age stayed with him until the paramedics arrived.[62] The police asked Age to wait outside, and eventually they showed her a bald man wearing a red shirt and dark pants and asked her if he was the man she saw hit the victim, to which she responded,

---

[50] State Rec., Vol. 6 of 8, trial transcript of September 25, 2013, pp. 57, 65.
[51] Id., at pp. 68, 71, 76-77, 144.
[52] Id., at p. 70.
[53] Id., at p. 71.
[54] Id., at p. 72.
[55] Id., at p. 63, 74.
[56] Id., at pp. 73-74.
[57] Id., at pp. 75-76.
[58] Id.
[59] Id., at p. 150.
[60] Id., at pp. 150-51, 161.
[61] Id., at p. 151.
[62] Id., at p. 152.

"Yes."[63]  Age explained that the officers did not force or threaten her to make an identification or promise her anything in exchange for doing so.[64]  Age testified that she was certain about her description and identification of the perpetrator.[65]

Wendy Wiltz testified that when a fight broke out on the second floor of the Republic, the victim pushed her out of the way.[66]  Wiltz saw a bald man with a dark complexion wearing a red button-down shirt and dark pants reach down into his boot.[67]  Wiltz ran into the office to report the fight.[68]  When she came back out, she saw the victim on the floor.[69]  Wiltz left the scene, but returned later to retrieve her car.[70]  At that time, she gave a statement to a detective.[71]  As she walked towards her car, she found a knife about fifteen to twenty feet away from the back door of the club.[72]

Deputy Don Hancock, the telephone supervisor for the Orleans Parish Sheriff's Office, identified a disc that contained recorded telephone calls of petitioner from November 29, 2010 until December 3, 2010.[73]  Those calls were played for the jury.[74]  While the state court record does not include a transcript or audio of the telephone calls, the trial transcript reflects that both Tasia Taylor, the mother of petitioner's son, and petitioner admitted to speaking to one another on the jail telephone.[75]  Petitioner further testified that, during one of his calls to Taylor, petitioner

---

[63] Id., at pp. 152-153
[64] Id., at p. 153.
[65] Id., at p. 166.
[66] Id., at pp. 169-170.
[67] Id., at p. 170.
[68] Id., at pp. 170, 174.
[69] Id., at p. 171.
[70] Id.
[71] Id., at p. 171.
[72] Id., at p. 172.
[73] Id., at pp. 181-185.
[74] Id., at pp. 184-185.
[75] State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, pp. 7-8, 91.

stated that he "helped his brother" during the altercation and "that's what got [him] involved in this."[76]

In support of his defense of mistaken identity, the defense presented the testimony of several witnesses. Tasia Taylor admitted that she spoke with petitioner via telephone on numerous occasions after his arrest.[77] Taylor testified that, "He didn't really give me too many details of what was going on. He advised me to watch the news."[78] Taylor told petitioner that she had learned from the news and other sources that it was alleged that he had stabbed someone.[79] On cross-examination, a telephone call between Taylor and petitioner was played for the jury.[80] When questioned about the telephone call, Taylor testified that petitioner never told her that he had a knife or that he threw it under the car.[81]

Desere Chachere testified that she was at the Republic when the incident occurred and saw petitioner and his brother, Jeremy Cameron.[82] According to Chachere, she and petitioner, who was wearing a red shirt and jeans, were standing next to one another when the fight broke out, but petitioner was not involved in the fight and did not strike anyone or stab anyone.[83] Chachere testified that petitioner's brother Jeremy was involved in the fight, but that petitioner did not assist him in the altercation.[84] Chachere admitted that she saw petitioner and his brother handcuffed outside of the nightclub, but that she did not tell the authorities petitioner was not involved in the altercation.[85]

---

[76] State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, p. 91.
[77] Id., at p.7-8.
[78] Id., at p. 8.
[79] Id., at pp. 11-16.
[80] Id., at pp. 17-18, 21.
[81] Id., at pp. 22-24.
[82] Id., at pp. 39-41.
[83] Id., at pp. 41-43, 46, 49.
[84] Id., at p. 45-46.
[85] Id., at p. 47.

Petitioner testified that he and his brother Jeremy drove to the Republic together.[86] According to petitioner, he was at the bar with Chachere when he saw his brother involved in a fight.[87] He claimed that after he was ushered outside with the crowd, the officers grabbed him, told him to show his hands, frisked him, and placed him in the back of a police car.[88] Petitioner testified that he did not have a knife and did not get into a fight that evening and did not have blood on his clothes or hands.[89] Petitioner admitted that he stated during a jail telephone call that he had helped his brother during the incident, but claimed he only wanted the people fighting with his brother to know the petitioner was Jeremy's brother.[90]

To the extent that petitioner is arguing that the jurors should not have found the state's witnesses credible, and should have believed his testimony as well as that of the other defense witness, that simply is not for this Court to say. Credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on such matters of credibility. See Schlup v. Delo, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) ( "[U]nder Jackson [v. Virginia] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) ], the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir.2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93–5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the Jackson standard for habeas relief."); Phillips v. Cain, Civ. Action No. 11–2725, 2012 WL

---

[86] Id., at p. 55.
[87] Id., at pp. 51, 54
[88] Id., at pp. 55, 57-58
[89] Id., at pp. 51-53
[90] Id., at p. 89, 91-92, 101.

2564926, at *14 (E.D. La. April 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012);

Picou v. Cain, Civ. Action No. 06–6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, for the reasons explained by the Louisiana Fourth Circuit Court of Appeal, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*.  Therefore, petitioner cannot show that the state courts' decisions rejecting his claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under these doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## B.  Prosecutorial Misconduct

In his next claim, petitioner alleges that the prosecution engaged in misconduct by asking Eric Roy, Sr., to describe his son, the victim.  He also claims the prosecution suborned perjury. Specifically, he claims that Detective Murdock, Detective Flores, Jeremiah LaFleur, Seneca Johnson, Nicole Age, Wendy Wilz, and Caroline Koerner all testified falsely at trial.

Petitioner first raised these arguments in his application for post-conviction relief.  The state district court found petitioner's claim to be without merit.[91]  The state district court explained that the moral quality of the victim was admissible pursuant to La. Code Evid. art. 404(A)(2)(a) and that there was no merit to the claim that the state allowed false testimony to be presented.[92] The Louisiana Fourth Circuit found that petitioner's claims were not supported by the record, citing La. Code Crim. P. art. 930.2.[93]  The Louisiana Supreme Court similarly found petitioner failed to satisfy his post-conviction burden of proof pursuant to La. Code Crim. P. art. 930.2.[94]

---

[91] State Rec., Vol. 1 of 8, Judgment dated January 26, 2017.
[92] Id., at p. 2.
[93] State v. Cameron, No. 2017-K-0133 (La. App. 4th Cir. April 5, 2017); State Rec. Vol. 8 of 8.
[94] State ex rel. Cameron v. State, 253 So. 3d 137 (La. 2018) (per curiam); State Rec., Vol. 8 of 8.

Federal courts apply "a two-step analysis to charges of prosecutorial misconduct." <u>United States v. Duffaut</u>, 314 F.3d 203, 210 (5th Cir. 2002). A court first decides whether the prosecutor's actions were improper and, if so, the court then determines whether the actions "prejudiced the defendant's substantive rights." <u>Id.</u> With respect to that latter determination, the court asks whether the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986). "A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted). Therefore, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982).

In assessing the impact of the prosecutorial misconduct, a court looks to such factors as whether the prosecutor's comments manipulated the evidence, misstated the evidence, or implicated other specific rights of the accused (such as the right to remain silent), whether the jury instructions addressed the issue, and whether there was substantial evidence to support the verdict. <u>See</u> <u>Darden</u>, 477 U.S. at 182.

With regard to petitioner's claim that the prosecutor committed misconduct when he improperly introduced evidence about the victim, the prosecutor asked Roy, Sr., the victim's father, one question regarding his son's character:

> Q.    Can you tell the Ladies and Gentlemen of the Jury a little but about your son?
> A.    Well, he's the type of son that most of you wish you would have had. He was loving, caring, very affectionate, very protective. Never gave me a day of trouble- twenty-six years of his life. Matter of fact, I can even go as far as to say even when I was working on my Master's degree, he was in high-school. He

showed me short cuts how to do [sic] – so a very educated, very intelligent young man who'd give you the shirt of his back any date.[95]

The prosecutor also asked:

Q.      Okay. And describe the experience that you had while your son was in [the] hospital.
A.      I – my son was a blessing to so many. While he was in the hospital – I saw young men and young ladies praying – had never prayed before. He had friends flying in from California, from all over the country, just to check on him. He was just that kind of person. If you was in need, he came to your assistance and so that whole time, it was just a lot of praying, a lot of medical attention, a lot of love. Just how he lived his life.[96]

The prosecution's two questions in no way manipulated the evidence, misstated the evidence, or implicated another specific constitutional right. The testimony was brief and the purpose of the victim's father's testimony as a whole was to identify the victim. Most importantly, the verdict was supported by overwhelming evidence, including multiple eyewitness identification. Therefore, there is no reasonable basis for concluding that the questions about the victim's character, even if improper, rendered the trial fundamentally unfair.

Petitioner's second claim of prosecutorial misconduct relating to the use of false testimony presents a mixed question of law and fact. Harvey v. Cain, Civ. Action No. 13-2994, 2013 WL 6490484, at *5 (E.D. La. Dec. 10, 2013). Therefore, to obtain federal relief, petitioner must show that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, it is clear that he has not made that showing.

It is true that due process may be violated if a prosecutor knowingly uses false testimony at trial or allows untrue testimony to go uncorrected. Giglio v. United States, 405 U.S. 150, 153

---

[95] State Rec., Vol. 5 of 8, trial transcript of September 24, 2013, p. 14.
[96] Id., at p. 15.

(1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996). However, a petitioner is entitled to relief on such a claim only if he shows that (1) the testimony in question was *actually* false, (2) the prosecutor *knew* it was false, and (3) the testimony was *material*. Duncan v. Cockrell, 70 F. App'x 741, 744 (5th Cir. 2003). "Evidence is 'false' if, *inter alia*, it is specific misleading evidence important to the prosecution's case in chief. False evidence is 'material' only if there is any reasonable likelihood that it could have affected the jury's verdict." Id.

Here, petitioner argues that the prosecution must have known that it was presenting perjured testimony because of conflicts between the testimony and the statements of different witnesses and because of inconsistencies between the various witnesses' trial testimony. However, perjury is the offering of "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993). Further, perjury is not established by mere contradictory testimony from witnesses or inconsistencies in a witness's testimony. Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001); Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990); United States v. Bingham, 653 F.3d 983, 996 (9th Cir. 2011) (noting that the fact that a witness has made inconsistent statements does not suffice to state a Napue claim). Rather, contradictory testimony from witnesses or inconsistencies in a witness's testimony at trial are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjured. Koch, 907 F.2d at 531; Webster v. McCoy, No. 9:030cv-00440, 2007 WL 2292994, at *5 (N.D.N.Y. Aug. 6, 2007) ("Inconsistencies, to the extent they may have existed, between the statements of certain witness contained in the police reports and the trial testimony goes to credibility, but does not necessarily make the testimony false or that the prosecution knew it was false." (footnotes omitted)).

Based on the record, the Court cannot conclude that any of the state's witnesses testified falsely.  Likewise, petitioner has failed to prove that the prosecution directed or procured the alleged false testimony.  For these reasons, petitioner has not shown that the state courts' decisions denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Therefore, relief is not warranted.

### C.  Right to Present a Defense

Petitioner claims that his counsel was prevented from presenting his actual innocence defense due to the trial court's sustaining two of the prosecution's objections to defense counsel's questions of petitioner regarding surveillance footage of another man.

Petitioner raised this issue in his application for post-conviction relief.  The state district court found that the claim was meritless and that no evidence had been provided to show the defense was denied the right to present a complete defense.[97] The Louisiana Fourth Circuit found that petitioner's claims were not supported by the record, citing La. Code Crim. P. art. 930.2.[98] The Louisiana Supreme Court similarly found petitioner failed to satisfy his post-conviction burden of proof pursuant to La. Code Crim. P. art. 930.2.[99]

During petitioner's testimony, defense counsel asked him numerous questions relating to the surveillance videos from both inside and outside the club.[100]  Part of that examination included the following exchange while the surveillance video was being played for the jury:

Q.      Is that you being hauled out of there?
A.      No, sir.
Q.      Do you know what happened to that fellow once –

---

[97] State Rec., Vol. 1 of 8, Judgment dated January 26, 2017, p. 3.
[98] State v. Cameron, No. 2017-K-0133 (La. App. 4th Cir. April 5, 2017); State Rec. Vol. 8 of 8.
[99] State ex rel. Cameron v. State, 253 So. 3d 137 (La. 2018) (per curiam); State Rec., Vol. 8 of 8.
[100] State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, pp. 52-57, 61-76, 78-83, 113-116.

MS. REED:

    Your Honor, I'm going to object to his narrating this video.

MR. REGAN:

    Do you know –

MS. REED:

    I'm sorry. I'm making an objection. Thank you. I'm going to object to him narrating. If he has a specific question, he can ask his client, but to narrate this video, the video speaks for itself. Thank you.

THE COURT:

    Defense?

MR. REGAN:

    The question I have is do you know what happened to the fellow they're hauling out the club?

MS. REED:

    Same objection, Judge

MR. REGAN:

    How is that – that's a question.

MS. REED:

    I'm –

THE COURT:

    Wait. I can't hear from both of you.

MS. REED:

    Thank you. I'm going to object to him narrating this video. The video speaks for itself. For him to try to testify that there's somebody else other than his client being dragged down those stairs is testifying.

THE COURT:

    Mr. Regan, the whole course can run properly if you can please refrain from testifying, refrain from commentary, and pose the question to the witness.

MR. REGAN:

    Certainly. Let me try again.

EXAMINATION BY MR. REGAN:

Q.    Do you Know what happened to the fellow they're pulling off the steps?

A.    No, sir.

Q.    Okay. Do you know what happened to him after they hauled him out the club?

MS. REED:

    Same objection, Judge.

THE COURT:

    Grounds, State?

MS. REED:

    The fact that he is leading this person. He is testifying.

THE COURT:

    Sustained. Mr. Regan, if you can just again try to pose your questions wherein you are not suggesting to the witness what response to provide.[101]

---

[101] Id., at pp. 62-64.

To the extent that petitioner claims the trial court's rulings violated state law, federal habeas corpus relief is available only to correct violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law.  Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998).  Any alleged impropriety based on state law does not warrant federal habeas review or relief.

To the extent that petitioner alleges a violation of federal constitutional law, a defendant has a constitutional right to present a complete defense.  Taylor v. Illinois, 484 U.S. 400, 408 (1988).  While the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, this right is not absolute.  Holmes v. South Carolina, 547 U.S. 319, 324 (2006).  Broad latitude is granted to states to establish rules excluding evidence from criminal trials. Id. at 324; Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013).  The Supreme Court has "[o]nly rarely [...] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." Nevada v. Jackson, 133 S. Ct. at 1992 (citations omitted). The Court has instead recognized that the Due Process Clause does not guarantee the right to introduce all evidence the defendant deems relevant, because the right to present even relevant evidence is not "absolute."  Montana v. Egelhoff, 518 U.S. 37, 42 (1996).  The right to present a complete defense is not "an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410.

In this case, the jury was shown surveillance videos relating to the night in question.[102] One of those videos apparently showed a person, who petitioner testified was not him, leaving the club.[103]  While the trial court sustained some of the state's objections to the defense's leading questions, those rulings did not impact his ability to present his mistaken identity/actual innocence

---

[102] The surveillance videos were not included in the State Record filed in his case.
[103] Id., at pp. 62, 64, 68-69.

defense.  It is clear from the record that petitioner testified that he was not the person who stabbed the victim, claimed that there was another person at the club who was dressed similarly to him, and, in fact, pointed out the allegedly similarly dressed man on the video.[104]  Furthermore, as previously explained, the defense presented the testimony of Desere Chachere who testified that petitioner was not involved in the altercation and that petitioner stood next to her during the entire incident.[105]

Thus, petitioner has not demonstrated that the state courts' decisions rejecting this claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects the claim.

### D.  Ineffective Assistance of Counsel

Petitioner alleges he received ineffective assistance of trial counsel.  He specifically argues that trial counsel was ineffective for failing to (1) object to inadmissible testimony regarding the victim's character; (2) object to Detective Murdock's false testimony that Seneca Johnson identified petitioner; (3) object to the state referencing petitioner's post-arrest silence; (4) object to Dr. Hunt's ambiguous testimony; (5) present the testimony of a blood splatter expert; (6) reveal all of petitioner's convictions to the jury; and (7) provide an exception to the hearsay rule during his questioning of Tasia Taylor.  He also claims his counsel's conduct through the trial was unprofessional and adversely affected the outcome of the trial.

These claims were denied by the state courts in Cameron's post-conviction proceedings. The state trial court found petitioner failed to show his counsel's representation fell below an

---

[104] Id., at pp. 73-74-75, 104, 109, 111.
[105] Id., at pp. 41-42, 45-46.

objective standard of reasonableness or that, but for counsel's alleged errors, the outcome of the trial would have been different.[106]   The Louisiana Fourth Circuit found the claims were not supported by the record, citing La. Code Crim. P. art. 930.2.[107]   The Louisiana Supreme Court thereafter denied petitioner's related writ application, stating, "Relator fails to show he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[108]

Here, the state courts correctly identified the clearly established federal law governing ineffective assistance of counsel claims: <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  As the state trial court noted, <u>Strickland</u> established a two-part test for evaluating such claims. Specifically, a petitioner seeking relief must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense.  <u>Id.</u> at 697.  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." <u>Jernigan v. Collins</u>, 980 F.2d 292, 296 (5th Cir. 1993); <u>see also</u> <u>Clark v. Johnson</u>, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  <u>Strickland</u>, 466 U.S. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998).

---

[106] State Rec., Vol. 1 of 8, Judgment dated January 26, 2017.
[107] <u>State v. Cameron</u>, 2017-K-0133 (La. App. 4th Cir. April 5, 2017); State Rec., Vol. 8 of 8.
[108] <u>State ex rel.</u> <u>Cameron v. State</u>, 251 So.3d 137 (La. 2018) (per curiam); State Rec., Vol. 8 of 8.

Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694, see also Williams v. Thaler, 602 F.3d 291, 310 (5th Cir. 2010).  Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice."  Day v. Quarterman, 566 F.3d 527, 536 (5th Cir. 2009) (quoting Strickland, 466 U.S. at 693).  In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome."  Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Strickland, 466 U.S. at. 694).  This standard requires a "substantial," not just "conceivable," likelihood of a different result.  Harrington, 562 U.S. at 112.

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett v. McCotter, 796 F.2d 787, 793 (5th Cir. 1986).  Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief.  See Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000) (citing Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983)).

Because ineffective assistance of counsel claims present mixed questions of law and fact, this Court must defer to the state court decision rejecting such claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.

Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (citations omitted; emphasis added). Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

### 1.    Failure to Object to Inadmissible Character Evidence

Petitioner claims his counsel was ineffective for failing to object to the victim's father's testimony regarding his son's character.

As previously explained, at trial, the state presented the very brief testimony of the victim's father, Eric Roy, Sr., who identified his son, Eric Roy, Jr., as the deceased.[109] When the prosecutor asked Roy, Sr., to describe his son, he responded:

Well, he's the type of son that most of you wish you would have had. He was loving, caring, very affectionate, very protective. Never gave me a day of trouble-twenty-six years of his life. Matter of fact, I can even go as far as to say even when I was working on my Master's degree, he was in high-school. He showed me short

---

[109] State Rec., Vol. 5 of 8, trial transcript of September 24, 2013, pp. 13-17.

cuts how to do [sic] – so a very educated, very intelligent young man who'd give you the shirt of his back any date.[110]

The prosecutor also asked the witness to describe the experience that he had while the victim was in the hospital, to which the witness responded as follows:

> A.    I – my son was a blessing to so many. While he was in the hospital – I saw young men and young ladies praying – had never prayed before. He had friends flying in from California, from all over the country, just to check on him. He was just that kind of person. If you was in need, he came to your assistance and so that whole time, it was just a lot of praying, a lot of medical attention, a lot of love. Just how he lived his life.[111]

Petitioner complains that his counsel failed to object to the testimony as inadmissible character evidence under La. Code Crim. Evid. art. 404(a)(2). It has been noted:

> Generally speaking, a failure to object, standing alone, does not rise to the level of constitutionally deficient performance. In cases where an accused complains that counsel was ineffective because he did not object to something ..., the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy.

Rios–Delgado v. United States, 117 F.Supp.2d 581, 589 (W.D. Tex.2000) (quotation marks omitted); accord Burnett v. Collins, 982 F.2d 922, 930 (5th Cir.1993); Forman v. Cain, Civ. Action No. 07–4200, 2008 WL 1746710, at *7 (E.D. La. Apr.14, 2008). Moreover, the United States Supreme Court has clearly held:

> *Judicial scrutiny of counsel's performance must be highly deferential*. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

---

[110] Id., at p. 14.
[111] Id., at p. 15.

Strickland, 466 U.S. at 689 (citation and quotation marks omitted; emphasis added).

Although the record includes no specific reason why counsel chose not to object to this brief testimony, it appears that defense counsel made a strategic decision not to object to the testimony of a grieving father so as not to antagonize the jury.  On cross-examination, defense counsel offered the witness his condolences and stated, "Your son was a very fine man and we accept that he shouldn't have been lost to your [sic] or your wife and his family."[112]  He confirmed with the witness that the victim was unconscious the entire time before he died, and, again offered his condolences and thanked the witness for coming.[113]

Defense counsel's decision not to object to the testimony falls soundly within the realm of reasonable trial strategy.  Even where an objection might have some chance of succeeding, an attorney is allowed to make a strategic choice to forgo such an objection to avoid antagonizing the jury.  See Wiley v. Puckett, 969 F.2d 86, 102 (5th Cir. 1992); see also Spicer v. Cain, Civ. Action No. 07-3770, 2007 WL 4532221, at *10 (E.D. La. Dec. 19, 2007).

Furthermore, petitioner has not shown a reasonable likelihood that the outcome of the trial would have been different had defense counsel objected to the testimony.  As previously indicated, petitioner's defense was that he was actually innocent and was mistakenly identified as the perpetrator.  There has been no showing by petitioner that the brief testimony regarding the victim's character in any way affected his defense.

Thus, petitioner has not demonstrated that the state courts' decisions rejecting this claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects the claim.

---

[112] Id., at p. 17.
[113] Id.

## 2.    Failure to Object to Detective Murdock's False Testimony

Petitioner next claims that defense counsel was ineffective for failing to object to Detective Murdock's false testimony that Seneca Johnson positively identified petitioner as the perpetrator.

Detective Murdock testified that he obtained a statement from Johnson and then conducted a show-up of petitioner.[114]  Murdock testified that Johnson positively identified petitioner.[115]  On cross-examination, defense counsel asked Murdock if he was aware that Johnson never saw the perpetrator's face, to which Murdock responded, "According to what I learned after interviewing her, I felt she was able to make a positive identification.  Therefore, we conducted the show-up procedure."[116]  Murdock testified that he believed that Johnson told him that she had seen the perpetrator's face.[117]

While Seneca Johnson testified that she did not see the face of the perpetrator who stabbed the victim[118], she testified that she saw a bald man wearing a red shirt with a black shirt underneath and dark pants stab the victim.[119]  Ultimately, when shown petitioner at the scene, she in fact identified him as the perpetrator and testified at trial that she was sure about her identification.[120]

As previously discussed, petitioner has not demonstrated that Murdock testified falsely.  Nor has he shown a reasonable probability that the outcome of the trial would have been different had defense counsel objected to Murdock's testimony that Johnson told him she saw the perpetrator's face.  Rather than raise a baseless objection, defense counsel vigorously cross-examined both Johnson and Murdoch and pointed out the inconsistencies in the testimony.

---

[114] Id., at p. 53.
[115] Id., at p. 54.
[116] Id., at p. 60.
[117] Id., at p. 61.
[118] Id., at pp. 31-32.
[119] Id., at pp. 25, 28, 32.
[120] Id., at pp. 29-30.

Petitioner has not demonstrated that the state courts' decisions rejecting this claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He is not entitled to relief as to this claim.

> **3.  Failure to Object to State's Reference to Petitioner's Post-Arrest Silence**

Petitioner claims that his counsel was ineffective for failing to object to the state's reference to petitioner's post-arrest silence.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." The privilege "permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings." United States v. Ramos, 685 F.3d 120, 126 (2d Cir. 2012). It also allows a person to express his desire to remain silent, or to remain silent until he has the assistance of an attorney. Cf. Wainwright v. Greenfield, 474 U.S. 284, 295 n.13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) ("With respect to post-Miranda warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted."). In general, the prosecution is prohibited from using a defendant's post-arrest silence as incriminating evidence or for impeachment purposes. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed. 91 (1976). A remark by a prosecutor constitutes a comment on a defendant's silence if the manifest intent was to comment on the defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark. United States v. Carter, 953 F.2d 1449, 1464 (5th Cir.1992), cert. denied sub nom., Hammock v. United States, 504 U.S. 990, 112 S.Ct. 2980 (1992).

At trial, Flores testified that, after he advised petitioner of his rights, petitioner advised that he did not want to give a statement.[121]  Petitioner admits that defense counsel objected to this testimony.  The record reflects that the defense's objection was addressed at the bench and the state moved on to another query.[122]  During a break from the proceedings, defense counsel moved for a mistrial based on Flores's testimony that petitioner did not want to give a statement, which the trial court denied.[123]  Given the defense's objection to Flores' testimony and his unsuccessful request for a mistrial, petitioner has not shown that he was ineffective or any resulting prejudice.

Petitioner, however, also claims his counsel failed to object to a second occurrence which he asserts was an "an obvious attempt by the State to impeach Cameron with his post arrest silence."[124]  The line of questioning began with the prosecution questioning petitioner, "Did you not say to the person on the jail call that you helped your brother and that's what got you involved in this?" to which petitioner responded, Yes."[125]  Petitioner then testified as follows:

> [W]hen the incident broke out and all of us was being escorted out the club, I was going and my brother had the incident.  After everybody was being escorted out, I went down there by the incident as it was going on.  The incident occurred and I was getting my brother, getting out of the club and we fell down the steps.[126]

Petitioner further claimed that he saw his brother on the ground, "And I was going over there to help him, to tell the people – the [sic] tell the ones that I was detained at [sic], that's my brother, what's going on, what's going on with my brother.  And as I'm talking and they're struggling, we all fell down the steps."[127]  Despite at least twice describing his actions as trying to "help" his brother in his trial testimony, petitioner also insisted on the stand that he did not attempt

---

[121] State Rec., Vol. 5 of 8, trial transcript of September 24, 2013, pp. 122-23.
[122] Id.
[123] Id., at pp. 162-163.
[124] Rec. Doc. 5-1, p. 24.
[125] State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, p. 91.
[126] Id.
[127] Id., at p. 92.

to save his brother or involve himself in the altercation.[128]  He repeatedly claimed he merely was

trying to let the individuals around his brother know who petitioner was and "that's my brother."[129]

Then the following exchange occurred between the prosecutor and petitioner:

> Q.      Okay.  You didn't walk out and take your time, right?
> A.      No, ma'am.
> Q.      There was security in the club that night?
> A.      Yes.
> Q.      There were bouncers?
> A.      Yes, ma'am.
> Q.      Were there bouncers on the second floor?
> A.      Yes, ma'am.
> Q.      At what point did you go and tell a bouncer about this –
> A.      I didn't tell a bouncer.  I was talking to the individuals who was right there over my brother.
> Q.      Okay.  At what point on this video were you doing this?
> A.      Well, you never showed the upstairs floor.
> Q.      Mr. Regan never showed it to you?
> A.      Mr. Regan either.
> Q.      So if we were to queue up the video [sic], we would see you stand around long enough talking to somebody about what happened to your brother?
> A.      I was detained.  How could I do that?
> Q.      Okay.  And so until this day you never said anything about your brother, helping your brother?
> MR. REGAN:
>        Excuse me.  Objection.
> THE COURT:
>        Grounds?  I'm sorry
> MR. REGAN:
>        Objection.  Vague.  What period of time are we talking about?
> THE WITNESS:
>        Exactly.
> THE COURT:
>        Overruled.  She said until this day.
> MR. REGAN:
>        What day?
> THE COURT:
>        Today, sir.  Until this day.
> MR. REGAN:
>        I don't think he's seen his brother today.

---

[128] Id.
[129] Id., at pp. 92-93.

THE COURT:
  Mr. Regan, you're trying to testify again. Overruled.
MR. REGAN:
  The question –
THE COURT:
  I'm sorry. The objection has been overruled. You can't tell the State how you want them to ask the question.
MR. REGAN:
  Please note my objection.
THE COURT:
  Yes, sir.
MS. REED:
  I'll move on, Judge.[130]

Petitioner's testimony regarding the chronology of the events was at best confusing and inconsistent. He appears to testify that an incident broke out that required the patrons to leave the club, but then his brother either got involved in the incident or was involved in a separate one. Regardless, he claimed that, while he was not trying to involve himself in the incident or save his brother, he tried to identify himself to those persons surrounding his brother during his brother's incident, which of course occurred prior to petitioner's arrest.

Petitioner complains counsel should have objected because the prosecution asked improper questions meant to elicit the fact that petitioner never explained himself to the police. The court disagrees. This would not be a fair reading of what was admittedly a muddled and messy exchange, and thus defense counsel did not err in not objecting specifically on that basis. It seems highly unlikely from the exchange above, particularly in the context of the testimony that preceded it, that the jurors would have concluded that the prosecution was referring to petitioner's post-arrest silence. Importantly, the prosecutor did not refer to the police of Cameron's refusal to give a post-arrest statement to Flores.

---

[130] Id., at pp. 92-93.

Given the lack of clarity of the questioning, it was reasonable for defense counsel not to object based on an improper reference to petitioner's post-arrest silence.  Thomas v. Thaler, 520 F. App'x 276, 281 (5th Cir. 2013) ("panels from this court have recognized that deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed"). However, the record shows that defense counsel actually did object in this exchange, even insisting, after the trial judge had ruled, "Please note my objection," which she did.  There is nothing more defense counsel could have done at this point.  Nor can it be said it was ineffective of defense counsel to fail to insist on discussing it more or to be explicit that his objection was specifically related to post-arrest silence.  More harm than good certainly could have resulted from doing so.  See Dodson v. Stephens, 611 F. App'x 168, 176 (5th Cir. 2011) ("[s]ince an objection may tend to emphasize a particular remark to an otherwise oblivious jury, the effect of objection may be more prejudicial than the original remarks") (quoting Walker v. United States, 433 F.2d 306, 307 (5th Cir. 1970)).

Further, petitioner has failed to show any prejudice.  Defense counsel did in fact object to the line of questioning, and while his objection was overruled, the prosecution ultimately moved on to another line of questioning.

Further, petitioner has failed to show any prejudice.  Defense counsel did in fact object to the line of questioning, and while his objection was overruled, the prosecution immediately moved on to another line of questioning.

Petitioner has not demonstrated that the state courts' decisions rejecting this claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He is not entitled to relief as to this claim.

### 4.    Failure to Object to Dr. Hunt's Ambiguous Testimony

Petitioner next claims that his counsel was ineffective for failing to object to Dr. Hunt testifying "contrary to the facts of this case" and suggesting that "from the moment Roy was stabbed in his head that he only bled internally."[131]  Petitioner claims that there was evidence that the victim's stab wounds bled externally and that the testimony of Dr. Hunt was purposefully ambiguous to mislead the jury.  He claims that the blood from the stab wounds should have splattered onto the perpetrator, and as petitioner did not have any blood on his clothing, he could not have been the perpetrator of the crime.[132]

Dr. Hunt, a trauma surgeon who treated the victim, testified that the victim suffered two stab wounds, one of which was four to five centimeters into his head and severed a large branch of the middle cerebral artery.[133]  When the prosecution asked, "having looked at the wound Mr. Roy suffered, would you be able to tell the Ladies and Gentlemen of the Jury if that type of wound would cause a large flow of blood?," Dr. Hunt responded, "Not necessarily."[134]  He explained that often bleeding is confined within the skull which causes high intra-cerebral pressure.[135]  He further testified a lot of the bleeding the victim sustained *may* have been internal and that the initial CAT scan showed a lot of internal bleeding.[136]

While petitioner contends that defense counsel should have objected to that testimony, he gives no legal basis for counsel to object.  Dr. Hunt did not testify that such a wound would not have bled externally.  He testified that, based on the medical evidence, there was a lot of internal bleeding.  While defense counsel could have questioned Dr. Hunt about external bleeding, he

---

[131] Rec. Doc. 5-1, p. 24, 25.
[132] Petitioner intertwines this claim with his claim that his counsel was ineffective for failing to present a blood splatter expert.  For ease of analysis, the Court addresses that claim separately in section 5.
[133] State Rec. Vol. 6 of 8, trial transcript of September 25, 2013, pp. 45-46.
[134] Id., at p. 53.
[135] Id.
[136] Id. (emphasis added).

apparently made a tactical decision to conduct a brief cross-examination confirming that Dr. Hunt could not identify the perpetrator of the crime.[137]  Defense counsel's strategy falls soundly within the realm of reasonable trial strategy.

Further, petitioner has not shown a reasonable probability that the outcome of the trial would have been different had counsel objected.  Again, petitioner has not demonstrated a legal basis to object to the testimony.  Nor has he shown that questioning Dr. Hunt about external bleeding or blood splatter would have resulted in testimony beneficial to his defense.

For these reasons, petitioner has not demonstrated that the state courts' decisions rejecting this claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He is not entitled to relief as to this claim.

### 5.     Failure to Present a Blood Splatter Expert

Petitioner claims that his counsel was ineffective for failing to present an expert witness in blood splatter to refute Dr. Hunt's testimony.  Petitioner also claims that "Cameron's trial counsel failed to take steps to obtain independent experts to assist in preparing and presenting a proper defense on Cameron's defense."[138]

The Fifth Circuit has held:

Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, *we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.*  This requirement applies to both uncalled lay and expert witnesses.

---

[137] Id., at p. 54.
[138] Rec. Doc. 5-1, p. 31.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (emphasis added; citations, quotation marks, and brackets omitted); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).

In this case, petitioner merely speculates that a blood splatter expert would have testified that it is unlikely for a perpetrator to stab someone without getting blood splatter on the perpetrator. Petitioner, however, fails to even identify a specific blood splatter expert or any other expert. Petitioner has presented no evidence, such as affidavits from any expert witness, demonstrating that he or she was available to testify at the trial and would in fact have testified in a manner beneficial to the defense. Therefore, he obviously failed to meet his burden of proof with respect to this claim. See, e.g., Cox v. Stephens, 602 Fed. App'x 141, 146 (5th Cir. 2015) (rejecting claim that counsel was ineffective for failing to call witnesses at trial, noting, "Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.")

The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of Strickland. Petitioner is not entitled to relief on this claim.

### 6.    Failure to Reveal All of Petitioner's Convictions to the Jury

Petitioner faults defense counsel for failing to cover each of his convictions on direct examination which allowed the state to impeach him on cross-examination. Petitioner claims that his counsel was ineffective for not preparing him to testify.

The state district court, in finding petitioner failed to meet the <u>Strickland</u> standard, noted, "When testifying, Petitioner failed to accurately portray all prior convictions. Upon questioning by the State, it was presented that Petitioner had additional convictions he failed to mention during direct examination."[139]  On direct examination, petitioner testified that he had prior convictions for possession of marijuana and cocaine in both Jefferson and Orleans Parishes.[140]  On cross-examination, petitioner initially testified that he did not recall his 2001 and 2009 convictions for possession with the intent to distribute cocaine, but then admitted he had those two convictions as well as a conviction for possession of marijuana.[141]

Petitioner fails to provide any evidence in support of his contention that defense counsel did not prepare him to testify. On the contrary, he presented no evidence whatsoever as to what efforts counsel took or failed to take regarding the preparation of petitioner.

Further, a petitioner must prove "a reasonable probability" (not a mere possibility) that the trial would have resulted in a different outcome if he had been prepared. <u>Crane v. Johnson</u>, 178 F.3d 309, 312 (5th Cir. 1999). The record reflects that petitioner testified on direct examination that he had multiple drug convictions. While he admitted on cross-examination that two of those convictions were for possession with intent to distribute cocaine, rather than possession of cocaine, nothing in the record suggests that the outcome of the trial would have differed had he been better

---

[139] State Rec., Vol. 1 of 8, Judgment dated January 26, 2017.
[140] State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, pp. 85-86.
[141] <u>Id.</u>, at pp. 87-88.

prepared to testify at trial, particularly in view of other evidence of guilt beyond a reasonable doubt.

The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, <u>Strickland</u> .  Petitioner is not entitled to relief on this claim.

### 7.    Failure to Provide an Exception to the Hearsay Rule

Petitioner next claims that his trial counsel was ineffective in failing to provide an exception to the hearsay rule when the trial court sustained the state's objection to a question asked of Tasia Taylor by defense counsel.

On direct examination, defense counsel asked Taylor if she recalled having a telephone conversation with Cameron as to why he was charged.[142]  Taylor responded, "He didn't really give me too many details of what was going on.  He advised me to watch the news."[143]  The state lodged a hearsay objection which the trial court sustained and advised Taylor that she was not allowed to testify as to the statements of others.[144]  Defense counsel vigorously and repeatedly argued that testimony regarding a defendant's statement is not hearsay and that the telephone call had been played for the jury twice.[145]  When his arguments were unsuccessful, he moved for a mistrial, which was denied.[146]

The fact that defense counsel's arguments were unsuccessful does not render his assistance constitutionally ineffective.   <u>See Martinez v. Dretke</u>, 99 F. App'x. 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").  Furthermore, petitioner has failed to show a reasonable probability that the outcome

---

[142] State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, p. 8.
[143] <u>Id.</u>
[144] <u>Id.</u>
[145] <u>Id.</u>, at pp. 9-11.
[146] <u>Id.</u>, at p. 10.

would have been different had defense counsel raised a different hearsay exception. Petitioner simply was not prejudiced by Taylor's inability to testify regarding petitioner's statements to her, particularly where, as noted by defense counsel, the recording of the telephone call was played for the jury more than once. The jury heard what petitioner said during that telephone call.

For these reasons, petitioner has not demonstrated that the state courts' decisions rejecting this claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He is not entitled to relief as to this claim.

### 8.    Unprofessional Behavior Adversely Affected the Outcome of his Trial

Petitioner's final claim is that his counsel's "deficient performance, disrespectful attitude, and his unprofessional conduct throughout the course of the trial caused him irreparable prejudice."[147]  Petitioner claims defense counsel behaved in a manner inconsistent with the professional norm and caused him to be adversely affected in the presence of the jury. Petitioner points to five specific instances of contentious exchanges between defense counsel and the trial court.[148]

First, on September 25, 2013, during testimony of LaFleur, the trial court interrupted the prosecution's examination and stated:

> Gentlemen if you all could have a seat so that the jurors are not capable of seeing the notes that you're taking, I would appreciate it. And let the record reflect the Defense Counsel and his assistant and the defendant were seated right next to jurors, six, twelve – six and twelve.[149]

---

[147] Rec. Doc. 5-1, p. 27.
[148] Rec Doc. 5-1, pp. 27-30.
[149] State Rec., Vol. 6 of 8, trial transcript of September 25, 2013, p. 69.

Defense counsel, Mr. Regan, responded, "Let me assure you, we didn't write any notes for the jury

to see.[150]

Then the following exchange occurred:

THE COURT:
    I'm sorry.  That's incorrect.  Ms. Reed you can continue.
MR. REGAN:
    I respectfully disagree and –
THE COURT:
    The Court [sic] I observed writing and I just ask that you move over.  Ms.
Reed, continue.
MR. REGAN:
    You're suggesting misconduct.
THE COURT:
    It will continue outside the presence of the Jury.  I have noted on the record
what I have personally observed.  Ms. Reed, you can continue.[151]

After the state rested its case, and outside the presence of the jury, defense counsel

addressed his difficulty getting Chachere served with a subpoena to appear at trial.[152]   The

following exchange occurred:

THE COURT:
    Oh, I'm sorry.  No, I don't have anything about personal service.  The only
thing that has been returned to this Court is from Deputy Vale regarding domiciliary
service so if you had personal service, please present it to me.
MR. REGAN:
    Please, don't yell at me.  I'm –
THE COURT:
    Oh, I'm not yelling.
MR. REGAN:
    I handled this as a professional.
THE COURT:
    Well, you haven't but –
MR. REGAN:
    Well, let's do this okay.
THE COURT:
    You can, you can –
MR. REGAN:
    Let's do this slowly and professionally.

---

[150] Id.
[151] Id.
[152] Id., at pp. 209-210.

THE COURT:

  Hold up, hold up. You're not going to tell me what to let's [sic] do. You're not going to tell me any instructions because you do not order me around. You have been ignoring my questions. You have been disrespectful. You have been constantly giving comments despite the Court's orders. So once again, this is the order of the Court. Approach with the Instanter that shows personal service of Desere - [153]

After the discussion relating to Chachere, and still outside the presence of the jury, defense

counsel then returned to the matter regarding the taking of notes near the jurors.

MR. REGAN:

  Yes, ma'am. I – I – I'm, I was personally accused of taking notes and showing them to the jury at this point.

THE COURT:

  No, you were not. What I asked you to do, sir, was for you and your associate to move away from the area where the jurors were so they couldn't see any notes that were being taken. The reason why the Court said that is because I am looking at you and I am looking at Mr. Beckman and both of you have pen in hand and pen to paper. Whether or not your wrote anything, I was making a cautionary remark to have both of you move from that area so that no juror would see any notes.

MR. REGAN:

  The words of your, your statement is clear. You suggested that we were cheating and doing the wrong thing at this point.

THE COURT:

  Mr. Regan, the record is going to speak for itself. You are absolutely right and I hope that someone could point out to me from the Fourth Circuit that I said you were cheating.

MR. REGAN:

  You suggested that, at this point –

THE COURT:

  Okay. And so what is your motion? What is it that you'd like to –

MR. REGAN:

  --I, - I – I – I, at this point ask you to apologize to the jury for that comment you made about me and about us taking notes and sitting there. You suggested two things  You suggested, one, that we were, we were, we were cheating and two that the jurors were looking at our notes, which is offensive. It's truly offensive at this point.

THE COURT:

  Your, your request is hereby denied because the record is clear that none of the words were stated as you just put on the record so I am offended by the way in

---

[153] Id., at p. 210.

which you have interpreted what I said and have misstated what I said so work on trying to get your tv set up.[154]

The following day, on September 26, 2013, after the trial court sustained the state's hearsay objection to Taylor's testimony, the following exchange occurred:

> MR. REGAN:
>      It's standard law, Your Honor.  This is the Defendant's statement.
> THE COURT:
>      Mr. Regan, I'm sorry.  You can't say in front of the Jury that it's standard law, giving the appearance that I am ruling against what standard law is.  Hearsay is not permissible unless you can provide the Court with an exception to the hearsay rule, which you cannot.[155]

Finally, outside the presence of the jury, when defense counsel asked for additional time for Chachere to appear and for petitioner to make a final decision whether he wanted to testify, the trial court asked defense counsel multiple times how many minutes he needed.[156]  When counsel failed to respond, the trial court stated, "Mr. Regan, I have never had an attorney as disrespectful as you have been throughout the trial."[157]

Petitioner simply speculates that the foregoing exchanges adversely affected the outcome of his trial.  A review of the record reveals that defense counsel served as a zealous advocate for petitioner, as evidenced by his vigorous cross-examinations, frequent and strenuous objections and his multiple requests to secure the presence of Chachere in order to protect his client's rights and ensure that petitioner received a fair trial.  Even though defense counsel's words or actions sometimes provoked alleged negative comments by the trial judge, petitioner has not demonstrated that prejudice resulted.

---

[154] Id., at pp. 219-220.
[155] State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, pp. 10-11.
[156] Id., at pp. 35-36.
[157] Id., at p. 36.

In order to give rise to a constitutional violation, heated exchanges between judges and counsel must be so egregious as to taint the whole proceeding. See Patterson v. Cain, Civ. Action No. 10-4587, 2011 WL 7962615, at *12-13 (E.D. La. Oct. 14, 2011) (finding testy exchanges between judges and counsel when taken in context were not so egregious as to taint the proceedings, prejudice the jury, or in any way render petitioner's trial unfair, or his resulting conviction unconstitutional). Here, while two of the exchanges occurred in the jury's presence, most of the exchanges of which petitioner complains, occurred outside the presence of the jury. Regardless, when viewed in the context of the entire trial, petitioner has not demonstrated that the exchanges resulted in prejudice in the form of bias from the trial court or the jury or that the jury was led to a predisposition of guilt. The record demonstrates that the trial court signed numerous instanter subpoenas, an order for a private processor, recessed the trial twice, and issued an alias capias for Chachere's arrest in order to assist petitioner in securing Chachere's presence.[158] Further, as previously explained, the evidence of petitioner's guilt was overwhelming. Petitioner simply has not shown a reasonable probability that, but for counsel's behavior, the result of the proceeding would have been different.

The state courts' decisions rejecting this claim were not contrary to, nor did they involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Petitioner is not entitled to relief as to this claim.

## RECOMMENDATION

---

[158] State Rec., Vol. 1 of 8, minute entry dated September 23, 2013; minute entry dated September 24, 2013; minute entry dated September 25, 2013; Motion and Order to Appoint Special Agent for Service of Process filed September 23, 2013; Order dated September 23, 2013; Motion for Instanter Subpoena filed September 23, 2013; Order dated September 23, 2013; Instanter dated September 24, 2013; Motion and Order for Instanter Subpoena Duces Tecum filed September 24, 2013; Order dated September 24, 2013; Instanter dated September 25, 2013; Instanter (for Private Process Server) dated September 25, 2013; Motion and Order for Instanter Subpoena Duces Tecum filed September 25, 2013; Order dated September 25, 2013; Instanter (undated); Instanter dated September 26, 2013; State Rec., Vol. 5 of 8, trial transcript of September 24, 2013, pp. 158-61; State Rec., Vol. 6 of 8, trial transcript of September 25, 2013, pp. 5-6, 80-83, 221-27; State Rec., Vol. 7 of 8, trial transcript of September 26, 2013, pp.4-5, 28-38.

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Michael Cameron be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___30th___ day of January 2020.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**